UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| A.J. HEATH, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> STEPHEN A. PERRY, ADMINISTRATOR ) <br> GENERAL SERVICES ADMINISTRATION ) <br> ) <br> Defendant. ) | Case No. 4:03CV1173 JCH |

## **MEMORANDUM AND ORDER**

This matter is before the Court following a bench trial conducted March 14-15, 2005. Having considered the pleadings, trial testimony, exhibits, and proposed findings of fact and conclusions of law submitted by the parties, the Court hereby makes and enters the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

### **Findings of Fact**

1. Plaintiff A.J. Heath brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, for employment discrimination. He alleges harassment based on his race and sex and retaliation in violation of Title VII. (Complaint, Doc. 4).

2. Plaintiff began his employment with the federal government in 1970. (Defendant Perry's Proposed Stipulation of Fact ("Defendant's Facts"), Doc. 39, ¶1; Plaintiff's Proposed Stipulation of Fact ("Plaintiff's Facts"), Doc. 46.1, ¶1).

3. Plaintiff is an African-American male. (Complaint, ¶11).

4. Plaintiff is currently employed with the General Services Administration ("GSA") as a

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Construction Representative, GS_0809, Grade 12, Step 9 which currently corresponds to a salary of $76,980 per annum. (Defendant's Facts, ¶2; Plaintiff's Facts, ¶2; Plaintiff's Trial Testimony, Vol. I, p. 125).

5. From September 2000-August 13, 2001, Plaintiff was employed as a Supervisory Equipment Specialist with the Public Building Service (PBS), Property Management Division, St. Louis Property Management Center (SLPMC) at the Robert A. Young Federal Building in St. Louis, Missouri, which corresponded to a salary of $64,230 in 2001. (Plaintiff's Facts, ¶3). In Plaintiff's position as Supervisory Equipment Specialist he had supervisory responsibility for other employees.

6. In September 2000, Charles Meyer, Director of Property Management, SLPMC became Plaintiff's direct supervisor. (Defendant's Facts, ¶4; Plaintiff's Facts, ¶5; Mr. Meyer's Trial Testimony, Vol. II, p.146).

7. For the period preceding and during the matters complained of in Plaintiff's Complaint, Plaintiff's second-line supervisor was Jeffrey Neely, Director of Property Management, PBS, Kansas City, Missouri. (Defendant's Facts, ¶5; Plaintiff's Facts, ¶6; Mr. Meyer's Trial Testimony, Vol. II, p. 146).

8. Plaintiff hired an African-American male, Craig Crosby, for a position as an electrical worker in Fall 2000. (Plaintiff's Trial Testimony, Vol. I, p. 60). Mr. Crosby did not have all the necessary skills to perform the job prior to beginning employment and needed additional training in order to fulfill the requirements of the job. (Plaintiff's Trial Testimony, Vol. I, p. 60). Hosea Fletcher, also an African-American male and the lead electrician, was directed by Plaintiff to perform on the job training of Mr. Crosby. (Plaintiff's Trial Testimony, Vol. I, p. 60; Mr. Fletcher's Trial Testimony, Vol. II, p. 23). Mr. Meyer informed Plaintiff that he did not think that Mr. Crosby was qualified for the job, but ultimately signed off on his promotion. (Plaintiff's Trial Testimony, Vol. I, p. 61; Mr.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Meyer's Trial Testimony, Vol. II, p. 148).

9. Based on information he received from Thomas F. Yochim, Building Management Specialist, Mr. Meyer had concerns about Mr. Crosby not performing all the duties of his job. (Mr. Meyer's Trial Testimony, Vol. II, pp. 178-179). Mr. Meyer shared his concerns with Plaintiff, and asked Plaintiff to investigate the situation without discussing it with anyone, including Mr. Crosby. (Mr. Meyer's Trial Testimony, Vol. II, p. 179). Plaintiff confronted Mr. Crosby about concerns Mr. Meyer had over his job performance, despite Mr. Meyer's instruction to Plaintiff that he should keep the discussion between the two of them. (Mr. Meyer's Trial Testimony, Vol. II, p. 179). Mr. Meyer believed that Plaintiff had acted insubordinately by telling Mr. Crosby after he had been instructed not to do so. (Mr. Meyer's Trial Testimony, Vol. II, p. 179).

10. In connection with discussions over the performance of Mr. Crosby in his new position, Mr. Meyer addressed a group of African-American subordinates, including Plaintiff and Mr. Fletcher as "you people". (Mr. Fletcher's Trial Testimony, Vol. II, pp. 21-22, 24).

11. Plaintiff filed an EEO complaint within the GSA on February 28, 2001 regarding Mr. Meyer's disagreement with Plaintiff over Mr. Crosby and the fact that Mr. Meyer did not consult with Plaintiff on setting Linking Budget to Performance bonuses for Plaintiff's staff. (Plaintiff's Trial Testimony, Vol. I, p. 168-70).

12. On March 12, 2001, Mr. Meyer changed Plaintiff's performance standards to specify that there would be no more than two incidents of non-support for a superior for each rating period. (Plaintiff's Trial Testimony, Vol. I, pp. 63-64, 170-72; Mr. Meyer's Trial Testimony, Vol. II, pp. 166-67; Defendant's Ex. P, p. 6).

13. Plaintiff filed charges against Defendant with the Missouri Commission on Human Rights, charging Mr. Meyer and Mr. Neely with discrimination on May 7, 2001. (Complaint, ¶6).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

14. On June 13, 2001, Malcolm Chouinard, a Property Management Representative for GSA, wrote up a work ticket and placed it in Plaintiff's work basket after he had a conversation with Chief Broccardo of the Navy about work that needed to be done on the Tenth Floor of the Robert A. Young Federal Building. (Mr. Chouinard's Trial Testimony, Vol II, pp. 100-01, 110; Plaintiff's Trial Testimony, Vol. I, p. 131, Plaintiff's Ex. 6). Mr. Chouinard's job responsibilities include customer service, custodial inspections and maintenance inspections. (Mr. Chouinard's Trial Testimony, Vol. I, pp. 98-99). The work ticket designated work that needed to be done on ceiling tiles on the Tenth Floor Navy area in preparation for a visit by an Admiral scheduled for June 20, 2001. (Mr. Chouinard's Trial Testimony, Vol. II, pp. 100-01).

15. Plaintiff did not think that the ceiling tiles should be replaced because the roof continued to leak, and told his subordinates not to do any work on the area until the day before the Admiral was due to arrive. (Plaintiff's Trial Testimony, Vol I, pp. 76, 134). On June 15, 2001, Plaintiff told Mr. Chouinard that Mr. Chouinard could not direct Plaintiff to replace the ceiling tiles because he was not Plaintiff's supervisor. (Mr. Chouinard's Trial Testimony, Vol. II, p. 104; Mr. Meyer's Trial Testimony, Vol. II, p. 149). After being informed of this by Mr. Chouinard, Mr. Meyer then spoke with Plaintiff later that day and told him to replace the ceiling tiles, despite Plaintiff's thinking that tiles should not be replaced because the roof continued to leak. (Plaintiff's Trial Testimony, Vol. I, pp. 76, 134-35; Mr. Meyer's Trial Testimony, Vol. II, pp. 149-50).

16. On June 15, 2001, Malcolm Chouinard sent an e-mail to Plaintiff clarifying the earlier work ticket with respect to 15 ceiling tiles that needed to be replaced in the Tenth Floor Navy area. (Government Ex. K). Plaintiff was informed that Navy personnel had not reported any leaks in their area since Fall 2000. (Government Ex. K).

17. On June 18, 2001, Mr. Chouinard received a call from Chief Broccardo who informed Mr.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Chouinard that no ceiling tiles had been replaced up to that point. (Mr. Chouinard's Trial Testimony, Vol. II, p. 106). He received another phone call from Chief Broccardo on the morning of June 19, 2001, who was angry that still nothing had been done with respect to the ceiling tiles as of that time. (Mr. Chouinard's Trial Testimony, Vol. II, p. 107).

18. On June 19, 2001, Mr. Meyer, Plaintiff, and Mr. Tom Yochim had a conversation with Navy officials, who were upset because the ceiling had not yet been taken care of by GSA. (Plaintiff's Trial Testimony, Vol. I, p. 138; Mr. Yochim's Trial Testimony, Vol. II, p. 68; Mr. Meyer's Trial Testimony, Vol. II, p. 151). Mr. Meyer assured Navy officials that the tiles would be taken care of by the end of the day. (Plaintiff's Trial Testimony, Vol. I, pp. 138-39). Mr. Meyer instructed Plaintiff to replace the ceiling tiles, and not spray them. (Mr. Meyer's Trial Testimony, Vol. II, p. 151).

19. Following this conversation, work was performed under the direction of Plaintiff on the Tenth Floor Naval area including some replacement of ceiling tiles, and the spraying of some acoustic spray to cover water damage. (Plaintiff's Trial Testimony, Vol. I, pp. 139-140).

20. Debris and paint remained in the work area on the Tenth Floor Naval area after Plaintiff's staff performed work on the ceiling tiles and left the area. (Mr. Yochim's Trial Testimony, Vol. II, p. 72; Mr. Wood's Trial Testimony, Vol. II, p. 123). Mr. Yochim and Plaintiff examined the work that had been done around 4:00 p.m. on June 19, 2001. (Mr. Yochim's Trial Testimony, Vol. II. p. 73-74). Plaintiff felt that the work that had been done was sufficient. (Plaintiff's Trial Testimony, Vol. I, p. 140; Mr. Yochim's Trial Testimony, Vol. II. p. 73-74). Plaintiff then departed the premises and left work for the day. (Plaintiff's Trial Testimony, Vol. I, p. 140).

21. Naval personnel indicated to Mr. Yochim and Mr. John Wood, who was acting as Deputy Director for Mr. Meyer, that they were not satisfied with the work that had been done under the direction of Plaintiff to replace the ceiling tile. (Mr. Yochim's Trial Testimony, Vol. II, p.75; Mr.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Wood's Trial Testimony, Vol. II, p. 123).

22. Mr. Yochim arranged for an outside contractor, Olympus Building Services, to replace the damaged ceiling tiles in the evening of June 19, 2001. (Mr. Yochim's Trial Testimony, Vol. II, pp. 75-76; Plaintiff's Ex. 10). Fifty to sixty tiles were replaced on the evening of June 19, 2001. (Mr. Chouinard's Trial Testimony, Vol. II, p. 117; Mr. Wood's Trial Testimony, Vol. II, p. 124). This number of tiles was larger than the number indicated in the original work order from June 13, 2001 because GSA officials wanted to make up to Naval personnel for the delay in replacing the tiles. (Mr. Chouinard's Trial Testimony, Vol. II, p. 118; Mr. Wood's Trial Testimony, Vol. II, p. 124-25, 142).

23. Mr. Meyer believed that Plaintiff had acted insubordinately with respect to his handling of the replacement of the Navy ceiling tiles. (Mr. Meyer Trial Testimony, Vol. II, p. 153). He consulted with Yolanda Gunderson in Human Resources and his boss, Mr. Neely about steps that should be taken with respect to Plaintiff. (Mr. Meyer's Trial Testimony, Vol. II, p. 153-55).

24. On June 25, 2001, Mr. Meyer temporarily reassigned Plaintiff to duties at another federal building on 1520 Market Street, St. Louis, Missouri. (Plaintiff's Trial Testimony, Vol. I, pp. 65, 180; Mr. Meyer's Trial Testimony, Vol. II, p. 160). Mr. Meyer looked for a position to reassign Plaintiff permanently. (Mr. Meyer's Trial Testimony, Vol. II, p. 162). Mr. Meyer delegated supervisory responsibility for the maintenance work force previously performed by Plaintiff at the Robert A. Young Federal Building to Tom Yochim, Building Management Specialist on June 21, 2001 (Defendant's Ex. E; Mr. Yochim's Trial Testimony, Vol. II, p. 84; Mr. Meyer's Trial Testimony, Vol. II, p. 187-88).

25. When Plaintiff returned from vacation on or around July 10, 2001, he found that his work space had been reassigned and he was escorted out of the office. (Plaintiff's Trial Testimony, Vol.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

I, pp. 67, 82-84). On July 10, 2001, Plaintiff was given a 30-day special assignment detail after the Navy ceiling repair incident (Defendant's Facts, ¶12; Plaintiff's Facts, ¶12; Defendant's Ex. P, p. 2).

26. Mr. Meyer prepared a Request for Information dated July 10, 2001 regarding the ceiling tile incident (the "RFI") after consulting with Yolanda Gunderson in Human Resources and Mr. Jeff Neely. (Mr. Meyer's Trial Testimony, Vol. II. p. 153-159; Government Ex. C). The RFI detailed Mr. Meyer's interpretation of the ceiling tile incident and his conclusion that Plaintiff's conduct violated GSA Penalty Guide (OAD P 5410.1), Table II, Item 8 Misconduct...Insubordination: deliberate refusal to comply with authorized instructions issued by a supervisor, disrespect, insolence, and like behavior and ...Neglect of duty: ...unreasonable delay or failure in carrying out instructions. (Defendant's Ex. C). The RFI instructed Plaintiff that he had three days to respond with any comments and witness statements. (Defendant's Ex. C). The RFI also stated that after reviewing Plaintiff's facts and comments, Mr. Meyer may chose to decide that no penalty action would be taken. (Defendant's Ex. C).

27. Mr. Wood presented Plaintiff with the RFI, which Plaintiff refused to discuss or sign at that time and to which he never responded. (Plaintiff's Trial Testimony, Vol. I, pp. 85, 158-162; Mr. Wood's Trial Testimony, Vol. II, pp. 126-27; Mr. Meyer's Trial Testimony, Vol. II, pp. 197-98). Yolanda Gunderson from Human Resources then got involved, and Plaintiff still refused to participate in the Request for Information. (Plaintiff's Trial Testimony, Vol. I, pp. 85, 158-162).

28. Mr. Meyer completed "Factors in Penalty Selection Douglas Factors" applying each factor to Plaintiff and sent them to Yolanda Gunderson in Human Resource on July 30, 2001. (Defendant's Ex. B; Mr. Meyer's Trial Testimony, Vol. II, pp. 155-58).

29. On August 3, 2001 Plaintiff was given a notice of permanent reassignment effective August 13, 2001 to the non-supervisory position of Construction Representative at another government

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

building, 4300 Goodfellow. (Plaintiff's Trial Testimony, Vol. I, p. 86; Defendant Ex. L). This did not affect Plaintiff's pay or grade classification. (Plaintiff's Trial Testimony, Vol. I, p. 167). Plaintiff's vacated position was filled by an African-American male. (Mr. Wood's Trial Testimony, Vol. II, p. 127; Mr. Meyer's Trial Testimony, Vol. II, pp. 165-66).

30. On August 6, 2001, Plaintiff was given an Official Reprimand in connection with his handling of the replacement of the ceiling tiles. (Plaintiff's Trial Testimony, Vol I, pp. 86, 163; Defendant's Ex. A). The Official Reprimand informed Plaintiff that a copy of the reprimand would be placed in Plaintiff's Official Personnel Folder for three years, and that Plaintiff could request that Mr. Meyer withdraw the reprimand after one year. (Defendant's Ex. A). The Official Reprimand also detailed the procedure for filing a grievance over the reprimand. (Defendant's Ex. A). Plaintiff refused to sign the reprimand. (Defendant's Ex. A). Plaintiff did not use the grievance procedure to grieve the Official Reprimand. (Plaintiff's Trial Testimony, Vol. I, pp. 166).

31. On December 11, 2001, GSA sent Plaintiff a report of the EEO investigation. (Plaintiff's Trial Testimony, Vol. I, p. 186). Plaintiff requested a decision on December 30, 2001 and a final decision was issued on March 27, 2002. (Plaintiff's Trial Testimony, Vol. I, p. 187).

32. In his Complaint, Plaintiff makes the following claims for relief:

    1. An expungement of all reprimands from his employment records.

    2. A claim for a grade step increase to Level 10, retroactive to September 2000.

    3. A claim for $267,000 in compensatory damages.

    4. "Addiction to my health and family stative"

    5. Monetary Bonus Back Pay Awards comparable to other white supervisors.

(Complaint, ¶ 13).

## Conclusions of Law

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1.      This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e-5.

2.      At trial, the Court granted Defendant's motion for judgment as a matter of law on Plaintiff's claim of sexual harassment.   Fed. R. Civ. P. 50.

3.      To establish a *prima facie* case of hostile work environment racial harassment, Plaintiff must show: (1) he is a member of a protected group; (2) unwelcome harassment occurred; (3) a causal nexus existed between the harassment and his protected-group status; and (4) the harassment affected a term, condition, or privilege of employment. Bradley v. Widnall, 232 F.3d 626, 631 (8th Cir. 2000). Plaintiff does not need to show that the GSA knew or should have known of the conduct because the conduct as issue allegedly occurred at the hands of Plaintiff's supervisors.  Id.

3.      Plaintiff did not meet his burden to establish a prima facie case of racial harassment.  Although as an African-American, he is a member of a protected group, he has failed to meet his burden to show that unwelcome harassment occurred.   The sum of all evidence presented at trial against Mr. Meyer is not severe or pervasive enough to rise to the level of harassment in violation of Title VII.

4.      The only direct evidence presented about racial harassment were comments by Mr. Meyer addressing African-Americans as "you people."   "[M]ere utterance of an ... epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405 (1986).  It is only where such conduct becomes "severe or pervasive" that a Title VII violation may exist. Id.  Even assuming, but not holding that "you people" was a racial remark, this does not rise to the level of harassment under Title VII. Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981)(citations omitted)("More than a few isolated incidents of harassment must have occurred. Racial comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger Title VII's sanctions.").

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

5. Additionally, the other conduct relied up by Plaintiff, such as Mr. Meyer's disagreement with him over the hiring of Craig Crosby, not being consulted over the Linking Budget to Performance bonuses, or having other employees handle supervisory details, does not amount to harassment in violation of Title VII. Even if these circumstances were harassing, Plaintiff has failed to show that the alleged harassment was based upon his race and therefore cannot prove that there was a causal nexus between the alleged harassment and Plaintiff's status as an African-American. Bradley v. Widnall, 232 F.3d 626, 631-32 (8th Cir.2000).

6. To establish a prima facie case of retaliation, Plaintiff must show (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) a causal connection between the protected activity and the adverse employment action. Shanklin v. Fitzgerald, 397 F.3d 596, 603-604 (8th Cir. 2005). The defendant then may rebut the plaintiff's prima facie "case by advancing a legitimate, non-retaliatory reason for the adverse" action it took against the plaintiff. Rheineck v. Hutchinson Tech., Inc., 261 F.3d 751, 757 (8th Cir.2001). "If the defendant makes this showing, the plaintiff must demonstrate the defendant's proffered reason was a pretext for illegal retaliation". Id.

7. Plaintiff engaged in protected activity by filing an EEO complaint on February 28, 2001 and a formal complaint with the Missouri Commission on Human Rights on May 7, 2001.

8. Plaintiff makes various allegations about retaliatory conduct following his February 28, 2001 EEO Complaint. The changing of Plaintiff's performance standards to limit him to two episodes of non-support on March 12, 2001 does not amount to an adverse employment action because it did not alter Plaintiff's responsibilities. "An adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities." Bradley v. Widnall, 232 F.3d 626, 632 (8th Cir. 2000). Similarly, the Official Reprimand in August 2001 does not by itself constitute an adverse employment action because Plaintiff has not alleged that the

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Reprimand led to any reduced salary, benefits, seniority, or responsibilities, or any other materially significant disadvantage. Although "papering" an employee's file with negative reports and reprimands may sufficiently support a claim of retaliation, Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir.1997), it cannot constitute an adverse employment action unless the action resulted in reduced salary, benefits, seniority, or responsibilities, or any other materially significant disadvantage. Gagnon v. Sprint Corp. 284 F.3d 839, 851 (8th Cir. 2002); Flannery v. Trans World Airlines, Inc., 160 F.3d 425 (8th Cir.1998).

9. The reassignment of Plaintiff from Supervisory Equipment Specialist to the position of Construction Representative does constitute an adverse employment action despite the fact that Plaintiff's grade and pay were not changed. Tadlock v. Powell, 291 F.3d 541, 546 -547 (8th Cir. 2002) (holding that an employee's transfer from a supervisory position to a non-supervisory position within the FDIC constituted an adverse employment action despite both positions being the same grade due to the change in supervisory responsibility and perceived prestige).

10. Generally more than a temporal connection between the protected conduct and the adverse employment action is required to prove a causal connection between a protected activity and an adverse employment action. Peterson v. Scott County, 406 F.3d 515, 524 (8th Cir.2005); Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." Id. quoting Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam).

11. In this case, Plaintiff has presented no evidence other than temporal proximity between his complaints being filed and his reassignment in support of his claim for retaliation. Mr. Meyer testified

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

that he was notified in April 2001 that Plaintiff had filed an EEO claim, but that he "lost sight" of that until July 25, 2001, when he was notified by personnel in Kansas City that he was a defendant in an EEO discrimination claim. (Mr. Meyer's Trial Testimony, Vol. II, pp. 164-65). While the Court finds the situation somewhat suspicious, Plaintiff has presented no evidence that this was not in fact true. The temporal evidence alone is not sufficient to prove a causal connection between his protected activity and the adverse employment action and thus Plaintiff has failed to prove his prima facie case of retaliation.

12. Even if Plaintiff had proven his prima facie case of retaliation, he cannot rebut Defendant's legitimate non-discriminatory reason for his reassignment. Defendant has presented evidence that Plaintiff's continued insubordination, culminating in Plaintiff's refusal to cooperate in replacing the Navy ceiling tiles, as its reason for transferring Plaintiff out of a supervisory position. This satisfies Defendant's burden to prove a legitimate, non-discriminatory reason for the adverse employment action. Kiel, 169 F.3d at 1135 ("Our cases have repeatedly held that insubordination and violation of company policy are legitimate reasons for termination.").

13. Plaintiff has presented no evidence that Defendant's stated reason for his termination is pretextual beyond his own belief that Mr. Meyer targeted him as an African-American supervisor. Even if Plaintiff had proven his prima facie case of retaliation, his claim would fail because he did not meet his burden to show that Defendant's stated reason for transferring him to a non-supervisory position was pretextual. See, e.g. Hardin v. Hussmann Corp., 45 F.3d 262, 265 (8th Cir.1995) (suddenness of decision to terminate an employee evidence of pretext, as opposed to this case where permanent transfer was made over a month after ceiling tile incident after going through several levels of procedure); Kobrin v. University of Minnesota, 34 F.3d 698, 703 (8th Cir.1994) (employer offered inconsistent explanations for employment action, as opposed to this case where reasons given by

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Defendant remained constant);  Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 777 (8th Cir.1995) (pretext shown by evidence of disparate treatment between similarly situated individuals, as opposed to this case where no evidence of similarly situated employees was presented).

**IT IS HEREBY ORDERED** that Judgment is entered for Defendant Stephen A. Perry, Administrator, General Services Administration Systems, Inc.  A Separate Judgment Shall Accompany this Memorandum Opinion and Order.


Dated this 22  Day of July, 2005.


/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE

PDF created with FinePrint pdfFactory trial version www.pdffactory.com